## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**RAHMAN PHILLIP**,

*Plaintiff;*

v.

**GEO SECURE SERVICES, LLC,** *et al*,

*Defendants.*

**Case No. 2:22-cv-00565-JDW**

### <u>MEMORANDUM</u>

In this employment discrimination case, Rahman Phillip threw everything at the wall, but nothing stuck. Despite having nineteen months of discovery, Mr. Phillip has little to show for it, save for a messy wall. And the evidence he does have fails to create a genuine question as to whether he could prevail on any of his claims at trial. Thus, I will grant summary judgment against him.

## I.    BACKGROUND

### A.    Factual History

#### 1.    Mr. Phillip's employment with GEO

Mr. Phillip was born in the United States and is African American. He worked as a correctional officer for GEO Secure Services, LLC, at the George W. Hill Correctional Facility in Delaware County, Pennsylvania, from September 30, 2019, until August 15, 2020, when he was suspended pending an investigation into his conduct. GEO terminated Mr. Phillip on October 29, 2020.

About three to four months after he started working for GEO, Mr. Phillip told his supervisor, Lieutenant Amanda Lubrano, that he had knee pain. He asked Lt. Lubrano if he could be moved to a unit that did not do pipe tours.[1] According to Mr. Phillip, he requested that Lt. Lubrano assign him to other blocks that did not involve pipe tours or similar physical activity at least twenty-five times over the course of his employment, but Lt. Lubrano never granted his requests. Instead, she asked Mr. Phillip if he had a medical accommodation from GEO and directed him to contact Human Resources if he needed one. She also wanted him "to get stuff in writing." (ECF No. 25-3 at 106:7-8.) Mr. Phillip attempted to provide Lt. Lubrano with medical documentation. She directed him to provide the documentation to HR and did not review it herself.

GEO's employee handbook set forth GEO's procedures for requesting medical accommodations and directed employees to contact GEO's HR department with any accommodation request. Employees could contact anyone within HR to make a request for an accommodation. Mr. Phillip acknowledged that he received a copy of the employee handbook and read it.

In December 2019, Mr. Phillip went to HR about getting an accommodation. He did not request a specific accommodation at that time, but he told HR that Lt. Lubrano told him to turn in paperwork to HR if he needed an accommodation. At the same time,

---

[1]      Neither Party nor the record makes clear what a "pipe tour" is or why Mr. Phillip requested to be excused from doing it.

he reported that his knees were bothering him and that he intended to see a doctor about it. Mr. Phillip saw Dr. Anna Woods, and, in a letter dated December 27, 2019, Dr. Woods advised Mr. Phillip that his "knee xrays showed chronic arthritis ...." (ECF No. 25-3 at Ex. 11.) Mr. Phillips sent a copy of Dr. Woods's letter to HR "a couple weeks to a month" before March 12, 2020. (ECF No. 25-3 at 121:10-11.) On March 12, 2020, GEO's Regional Human Resources Manager, Darcy Valladares, sent Mr. Phillip a letter and an accompanying form to give to his physician, so that she could advise GEO whether Mr. Phillip could perform the essential functions of his job. The letter referenced Mr. Phillip's request for an accommodation.

On July 29, 2020, Mr. Phillip re-sent HR the same letter from Dr. Woods about his x-ray results. On August 10, 2020, Mr. Phillip received the completed accommodation form from his medical provider and forwarded that form to HR. The accommodation paperwork stated that Mr. Phillip could not do special housing, pipe tours, or work details and that he only could stand 50% to 75% of the time. It also said that he could walk up to 100% of the time. HR did not take any further action with respect to Mr. Phillip's request for an accommodation after receiving that form.

### 2.    Mr. Phillip's suspension and termination

On August 14, 2020, an inmate attacked another correctional officer, Officer Mark Nyan, approximately ten to twelve feet away from Mr. Phillip. Mr. Phillip did not assist Officer Nyan, but he signaled a major incident by calling a "code black" and put other

inmates into their cells. Another correctional officer attempted to assist Officer Nyan, who suffered severe injuries during the attack. The next day, GEO suspended Mr. Phillip. That was the last day he worked at the prison.

GEO investigated Mr. Phillip's response to the attack on Officer Nyan. The investigation included a review of incident reports from correctional officers, including Mr. Phillip, and interviews of witnesses. Sgt. Komla Amouzou authored an incident report, even though he was not there when it happened. Rather than describe what happened during the attack, Sgt. Amouzou's report recounts a conversation he had with Mr. Phillip the following day, during which he claims that Mr. Phillip remarked that Officer Nyan needed "to learn how to fight." (ECF No. 25-7 at Attachment 6.) Mr. Phillip denies making this comment, and he contends that Sgt. Amouzou's report and other correctional officers' incident reports contain false information about what happened during the attack. According to Mr. Phillip, supervisors directed officers how to draft incident reports, sometimes instructing them to include inaccurate information. Based on his experience and the fact that other officers' incident reports conflict with his account of what happened, Mr. Phillip believes that certain supervisors told those officers to include false information in their respective reports, though he has no direct proof of that. He contends that they decided to use him as the "fall guy" for what happened to Officer Nyan because the other officers, including Officer Nyan, are of African descent, whereas Mr. Phillip is not. (ECF No. 25-3 at 181:9 – 182:8.)

GEO's investigation concluded that in failing to render assistance to Officer Nyan during the attack, Mr. Phillip violated GEO's standards of employee conduct. On October 28, 2020, David Byrne, the Facility Administrator, and Ms. Valladares from HR issued a termination request to Nicole Moody, the Director of Human Resources, recommending that GEO terminate Mr. Phillip. The next day, GEO terminated Mr. Phillip's employment for gross negligence under the governing collective bargaining agreement and for violating GEO's standards of conduct. Mr. Byrne, Ms. Moody, Ms. Valladares, and GEO's Vice President, John Oliver, participated in the decision to terminate him. A disciplinary action form lists Mario Colucci as Mr. Phillip's supervisor, but Mr. Phillip testified that Mr. Colucci tended to operate behind the scenes, in administration, and was "not hands on." (ECF No. 25-3 at 31:2-10.)

## B.    Procedural History

### 1.    Relevant pre-suit filings

On October 27, 2020, Mr. Phillip filed a charge of discrimination against GEO with the Equal Employment Opportunity Commission, asserting race and disability discrimination, as well as retaliation. A few months later, Mr. Phillip retained an attorney. On January 28, 2021, he filed an amended charge of discrimination with the EEOC through his attorney, adding a claim of national origin discrimination. On March 8, 2021, a different attorney representing Mr. Phillip filed a voluntary bankruptcy petition on Mr. Phillip's behalf in the United States Bankruptcy Court for the District of Delaware. Mr. Phillip did

not list his employment discrimination claims against Defendants in his bankruptcy filing;

nor did he amend his petition to include this information. The bankruptcy court entered

a discharge order on June 9, 2021.

### 2.      The present lawsuit

On February 14, 2022, Mr. Phillip filed this lawsuit, asserting disparate treatment

and retaliation based on race and national origin under Title VII, 42 U.S.C. § 1981 ("Section

1981"), and the Pennsylvania Human Relations Act ("PHRA"), as well as disparate

treatment, failure to accommodate, and retaliation under the Americans with Disabilities

Act ("ADA") and the PHRA. Mr. Phillip also brought aiding and abetting claims under the

PHRA against Lt. Lubrano and Mr. Colucci. Defendants moved for summary judgment on

all the claims asserted against them,[2] and the motion is ripe for disposition.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter,

summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). In ruling on a summary judgment motion, a court must "view the facts and draw

---

[2]      In his opposition to Defendants' motion for summary judgment, Mr. Phillip makes
a passing reference to a "hostile work environment created under Defendant's watch ...."
(ECF No. 26-1 at 20-21.) However, Defendants did not seek summary judgment on a
hostile work environment claim because Mr. Phillip did not assert such a claim in his
Complaint. At most, he used the word "harassment," and the mere invocation of that term
does not give Defendants fair notice that he intended to assert a hostile work environment
claim against them. Thus, there is no hostile work environment claim at issue in this case.

reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

"he non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If he fails to do so, then the court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

## III.    DISCUSSION

### A.    Judicial Estoppel[3]

Judicial estoppel bars Mr. Phillip from recovering certain monetary damages in this case because he failed to disclose his claims in a prior bankruptcy proceeding. This equitable doctrine prohibits a party from "gain[ing] an advantage by litigation on one theory, and then seek[ing] an inconsistent advantage by pursuing an incompatible theory" later. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003) (quotation omitted). Not every inconsistency warrants estoppel, however.

---

[3]    Defendants did not raise judicial estoppel in their Answer to Mr. Phillip's Complaint. However, Mr. Phillips did not argue waiver; instead, he addressed the merits of the argument, so I won't apply waiver. *See Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1374 (3d Cir. 1993).

*See id*. Instead, estoppel applies when: (1) the party to be estopped has taken two positions that are irreconcilably inconsistent; (2) the party changed his position 'in bad faith – i.e., with intent to play fast and loose with the court[;]" and (3) the estoppel is "'tailored to address the harm identified' and no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Krystal*, 337 F.3d at 319 (quotation omitted). In this case, all three elements are satisfied.

*First*, Mr. Phillip took two irreconcilably inconsistent positions by failing to disclose his employment discrimination claims against Defendants in his bankruptcy petition and yet pursuing those claims here. It is undisputed that Mr. Phillip failed to disclose his employment claims against GEO despite knowing they existed.

*Second*, Mr. Phillip has not offered any evidence to rebut an inference of bad faith in failing to disclose his claims. In the Third Circuit, "a rebuttable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose." *Krystal*, 337 F.3d at 321. Again, there is no dispute that Mr. Phillip was aware of his claims at the time he filed his bankruptcy petition. And he had a motive to conceal those claims to try to keep any proceeds from this case for himself, rather than his creditors.

When Mr. Phillip first filed a charge of discrimination with the EEOC in October of 2020, he did so *pro se*. However, he then retained an attorney who filed an amended charge with the EEOC just thirty-nine days before he filed his bankruptcy petition. The fact

that an attorney agreed to represent Mr. Phillip on a contingent basis in pursuit of his employment claims against Defendants signals to Mr. Phillip (and in general) that those claims have value because it means that an attorney vetted the claims and decided they were worth an investment of the attorney's time. Thus, Mr. Phillip had a motive to hide those claims from his creditors in the bankruptcy proceeding, and he does not argue to the contrary. Instead, he suggests judicial estoppel should not apply because he did not "actively conceal" his claims against Defendants in the bankruptcy court. (ECF No. 26-1 at 23.) Even if true, that fact does not rebut the presumption of bad faith when Mr. Phillip had an affirmative duty to *disclose* the claims and sufficient motivation to remain silent.

*Third*, while judicial estoppel "is to be used sparingly and reserved for the most egregious case[,]" *Krystal*, 337 F.3d at 324, I can utilize judicial estoppel in a way that is tailored to recognize the harm to Mr. Phillip's creditors without dismissing his case in full. In cases like this one, where judicial estoppel is warranted, judges have applied the doctrine to limit a plaintiff's recovery based on whether the damages sought would have been available to creditors as part of the bankruptcy estate. *See, e.g.*, *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1289 (11th Cir. 2002), *overruled on other grounds by Slater v. United States Steel Corp.*, 871 F.3d 1174 (11th Cir. 2017) (applying judicial estoppel to claims for monetary damages but declining to apply it to bar a non-disclosed claim for injunctive relief "that offered *no monetary value* to the estate") (emphasis added). Such an approach makes sense in this case.

If Mr. Phillip had a claim for unpaid wages, or even were earning wages, while he proceeded through bankruptcy, that money would have been part of the estate. He deprived the estate of any claim for that money in this case. As a result, Mr. Phillip will not be able to recoup any monetary damages (*i.e.,* backpay, compensatory, punitive, liquidated, and/or statutory damages, etc.) from the period before March 8, 2021, because those damages would have been part of the bankruptcy estate. *See* 11 U.S.C. § 541(a)(6) (earnings before the commencement of the bankruptcy case are part of the estate).

## B.    Failure To Accommodate Under The ADA And PHRA

The ADA's interactive process is a two-way street. Because Mr. Phillip was responsible for the breakdown in that process, he cannot prevail on his failure to accommodate claims under the ADA and PHRA. To prevail on a failure to accommodate claim under either statute, Mr. Phillip must show: (1) GEO knew about his disability; (2) he requested an accommodation or assistance for his disability; (3) GEO did not make a good faith effort to assist him in seeking an accommodation; and (4) GEO could have reasonably accommodated him but for its lack of good faith. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quotation omitted). Mr. Phillip has not come forward with evidence that GEO failed to make a good faith effort during the interactive process, so he cannot prevail on his failure to accommodate claim.

In the Third Circuit, "[e]mployers can show their good faith in a number of ways, such as ... request[ing] information about the condition and what limitations the employee

has[.]" *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999). On March 12, 2020, GEO did just that when Darcy Valladares sent Mr. Phillip a letter and an accompanying form to give to his doctor, so that the doctor could advise GEO whether Mr. Phillip needed an accommodation to perform the essential functions of his job.[4]

At that point, the ball was in Mr. Phillip's court to proceed with his request for an accommodation. Indeed—as the name suggests—the ADA requires both the employer **and** the employee to participate in the interactive process. Thus, "an employer cannot be faulted if … the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals." *Taylor*, 184 F.3d at 317. But Mr. Phillips did not submit the completed form from his doctor until August 10, 2020, and his five-month delay in providing the necessary information to HR (as opposed to any bad faith on GEO's part) led to the ultimate breakdown of the interactive process. That Mr. Phillip re-sent the initial letter from his doctor in July does not change this

---

[4]     Ms. Valladares sent this letter to Mr. Phillip after he requested an accommodation and gave her a letter from his doctor which explained that Mr. Phillip's "knee xrays showed chronic arthritis …." (ECF No. 25-3 at Ex. 11.) There is conflicting evidence in the record as to when Mr. Phillip first requested an accommodation from HR—either late December 2019 or "a couple weeks to a month" before Ms. Valladares sent him the form. (ECF No. 25-3 at 121:10-11.) Either way, there was a gap in time between Mr. Phillip's request for an accommodation and HR sending the form for his doctor to complete. Nothing in the record explains this delay, but Mr. Phillip has not argued in his opposition that the delay evidences GEO's bad faith. So, I have not considered it as part of my analysis. *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) ("[Courts] 'do not, or should not, sally forth each day looking for wrongs to right. [They] … normally decide only questions presented by the parties.'") (quotation omitted).

outcome because he gave that letter to HR months earlier. In fact, that December 2019 letter prompted HR to ask for more specific information about Mr. Phillip's condition.

Finally, no reasonable jury would conclude that GEO acted in bad faith by failing to offer Mr. Phillip an accommodation in the four-day period between the time Mr. Phillip sent-in the completed form and when GEO suspended him following the attack on Officer Nyan. Likewise, no reasonable jury would find that GEO acted in bad faith by not conferring with Mr. Phillip about a possible accommodation during his suspension. Because he was not at work during that time, there was no need to accommodate his disability.

Mr. Phillip's arguments to the contrary fall short. HIs entire claim appears to be premised on Lt. Lubrano's repeated refusals to change his shifts as he requested, but her refusals do not support his failure to accommodate claim. Even if Mr. Phillip continued to request shift changes from Lt. Lubrano as an accommodation for his disability, it does not change the fact that he was not participating in the interactive process. Mr. Phillip's repeated requests to Lt. Lubrano do not absolve him from failing to gather the information that GEO requested from his physician about whether he could perform the essential functions of his job.

In addition, no matter how many times Mr. Phillip asked Lt. Lubrano to change his shift, it is undisputed that both Lt. Lubrano and GEO's employee handbook directed Mr. Phillip to HR if he needed an accommodation. While Lt. Lubrano had the ability to change

employees' shifts, it is undisputed that she lacked authority to grant an employee's request for an accommodation. And, in any event, "[t]he ADA does not obligate employers to make on-the-spot accommodations of the employee's choosing." *Brumley*, 909 F.3d at 840. The fact that Lt. Lubrano and GEO directed Mr. Phillip to follow company procedures by submitting his request for an accommodation with HR does not constitute a failure to accommodate. *See, e.g.*, *McLaughlin v. Walmart*, No. 22-cv-3272, 2023 WL 7706262, at *4 (E.D. Pa. Nov. 15, 2023).

**C.    Discrimination Under Title VII, Section 1981, The ADA, And The PHRA**

**1.    *Prima facie* case**

The familiar *McDonnell Douglas* framework applies to each of Mr. Phillip's claims for disparate treatment under Title VII, Section 1981, the ADA, and the PHRA. To prevail on these claims, Mr. Phillip must establish a *prima facie* case by showing that: "(1) [he] is a member of a protected class; (2) [he] was qualified for the position [he] sought to attain or retain; (3) [he] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp.3d 419, 437 (E.D. Pa. 2023) (quotation omitted). All of Mr. Phillip's disparate treatment claims fail because he has no evidence that his termination occurred under circumstances raising an inference of discrimination.

Mr. Phillip's disparate treatment claims under the ADA and PHRA suffer from at least three flaws. *First*, because Mr. Phillip's evidence does not support a failure to

accommodate claim, that same evidence would not permit a reasonable factfinder to infer that GEO intended to discriminate against him based on his disability. *Second*, Mr. Phillip's continued reliance on Lt. Lubrano's repeated refusals to change his shifts does not give rise to an inference of intentional discrimination because it is undisputed that Lt. Lubrano played no role in Mr. Phillip's termination. *Third*, the timing of Mr. Phillip's suspension and eventual termination is not unduly suggestive of discrimination based on disability. There is evidence in the record that GEO may have been on notice of Mr. Phillip's disability as of December 2019, and the fact that GEO suspended him eight months later does not give rise to an inference of intentional discrimination.

Mr. Phillip's disparate treatment claims based on race and national origin discrimination under Title VII, Section 1981, and the PHRA fare no better. During his deposition, Mr. Phillip testified that he believes that Frank Kwaning (the union president), Lt. Lubrano, Lieutenant Sean Gallagher, and Chief Richard Leach discriminated against him based on his national origin. However, it is undisputed that none of these individuals was a decisionmaker who decided to terminate Mr. Phillip. Indeed, in his opposition brief, Mr. Phillip failed to address GEO's arguments about why there is no evidence demonstrating that any of these individuals discriminated against him based on his race or national origin.

Instead, Mr. Phillip tries to create an inference of discriminatory animus by pointing out that two colleagues of African descent (Sgt. Amouzou and Officer Nyan) were "key

players involved in the incident" that led to his termination. (ECF No. 26-1 at 6.) Though he does not say so expressly, Mr. Phillip implies that because the victim of the attack (Officer Nyan) was of African descent, other correctional officers of African descent agreed to blame Mr. Phillip because he is American.[5] He contends that other officers who submitted incident reports "had reason to treat Plaintiff differently due to his national origin." (ECF No. 26-1 at 6.) That statement is as factually unsupported as it is outrageous. Even if every single one of those coworkers is of a different national origin than Mr. Phillip, that fact alone is not evidence of intentional discrimination, and nothing in the record explains to me or a potential factfinder why Mr. Phillip's national origin would have motivated his coworkers to lie about what happened when Officer Nyan was attacked. Mr. Phillip's offensive assumption that they colluded to lie because they are of African descent is not evidence, and his counsel should be ashamed of making the argument.

Even if Sgt. Amouzou's alleged false statement about Mr. Phillip in the incident report is "a specific example of the bias against him due to his differing national origin," as Mr. Phillip contends (*id.*), it still does not tell me whether *GEO* discriminated against Mr. Phillip based on his race or national origin when it terminated him because Sgt. Amouzou played no part in that decision. Again, the mere fact that Sgt. Amouzou may be

---

[5]     The record lacks any actual evidence of any of these individuals' descent or national origin. Instead, Mr. Phillip just testified that "[t]here's a large group of employees that are officers that came from the continent of Africa. ... [A] lot of them come from Liberia; a lot of them come from Nigeria; some come from other cities in Africa." (ECF No. 25-3 at 33:13-18.)

of African descent is not evidence that he, or GEO, intended to discriminate against Mr. Phillip because he is American.

### 2. Pretext

Even if Mr. Phillip had sufficient evidence to support a *prima facie* case of disparate treatment under any of the statutes he relies on, his claims would still fail because he has no evidence that GEO's legitimate, non-retaliatory reason for terminating him—*i.e.*, gross negligence in responding to an attack on a fellow officer—was pretextual. To make this showing, Mr. Phillip must come forward with evidence to demonstrate that GEO's proffered explanation was false and that retaliation was the real reason it terminated him. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022). To overcome summary judgment at this step, Mr. Phillip "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 347 (quotation omitted). Again, Mr. Phillip's evidence comes up short.

Admittedly, the governing standard "places a difficult burden on the plaintiff[.]" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Indeed, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. In other words, a factfinder

will not be asked to determine whether GEO was right or wrong in concluding that Mr.

Phillip was grossly negligent during the attack on Officer Nyan. As a result, Mr. Phillip's

contention that he couldn't have been grossly negligent because he called a "Code Black"

and secured a crowd of inmates into their cells is not a reason to deny summary judgment.

GEO investigated and reached a conclusion. It is not a jury's job to second-guess it.

Likewise, Mr. Phillip's vague assertions that supervisors influenced or controlled the

information that officers put in their incident reports is not evidence that a supervisor did

so in this instance. Mr. Phillip has no evidence that any supervisor instructed anyone to

include false information in the incident reports about the attack on Officer Nyan. Instead,

"based on [his] experience being in the business," Mr. Phillip believes that someone

instructed the officers what to include in those reports. (ECF No. 25-3 at 265:13-14.) But

Mr. Phillip's assumptions or beliefs are not evidence; they are conspiracy theories. The

incident reports are not "highly suspicious" just because they contradict his version of

events. *See, e.g.*, *Mroczek v. Bethlehem Steel Corp.*, 126 F. Supp.2d 379, 390 (E.D. Pa.

2001In short, Mr. Phillip's personal, unsubstantiated views that unidentified supervisors

directed officers to falsify incident reports "is pure conjecture and is wholly insufficient"

to establish pretext and overcome summary judgment. *Atkinson v. LaFayette Coll.*, 460

F.3d 447, 455 (3d Cir. 2006).

**D.     Retaliation Under Title VII, Section 1981, The ADA, And The PHRA[6]**

**1.     *Prima facie* case**

The same framework applies to Mr. Phillip's retaliation claims under Title VII,

Section 1981, the ADA, and the PHRA. *See Canada*, 49 F.4th at 346. To prevail on those

claims, he must establish a *prima facie* case by demonstrating: (1) he engaged in protected

activity; (2) the employer took adverse action either after or contemporaneous with the

protected activity; and (3) a causal connection between the protected activity and the

adverse action. *Id.* The temporal proximity between Mr. Phillip's submission of the official

accommodation paperwork to HR on August 10, 2020, and the adverse action at issue—

his termination on October 29, 2020—is sufficient to create a question as to whether that

protected activity led GEO to fire him. *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206,

221 (3d Cir. 2017) ("An inference of 'unduly suggestive' temporal proximity begins to

dissipate where there is a gap of three months or more between the protected activity

_____

[6]     In his opposition to Defendants' motion for summary judgment, Mr. Phillip asserts that he "alleges retaliation based on several factors" with his requests for accommodation and filing an EEOC charge "being the most relevant." (ECF No. 26-1 at 15.) But he does not identify what those other factors are. He also failed to address GEO's argument as to why he cannot prevail on a claim of retaliation based on conduct by Lt. Gallagher and Chief Leach. To the extent Mr. Phillip intended to pursue alternate theories of retaliation based on additional protected activity or other acts of alleged retaliation (*i.e.* something other than his suspension and termination), he needed to address them in his brief. Mr. Phillip cannot evade summary judgment by alluding to unidentified claims or theories of liability, and he abandoned any claims or arguments that he failed to address in his opposition brief. *See, e.g.*, *Carroll v. Lancaster Cnty.*, 301 F. Supp.3d 486, 511, 512 (E.D. Pa. 2018) (deeming claims and arguments abandoned where plaintiff failed to respond to them in opposition to summary judgment).

and the adverse action."). Thus, he can establish a *prima facie* case of retaliation under the ADA and the PHRA.

However, Mr. Phillip cannot prevail on his race and national origin retaliation claims arising under Title VII, Section 1981, and the PHRA because he cannot establish a causal connection between his alleged protected activity—filing a charge with the EEOC—and his termination. Specifically, Mr. Phillip has not come forward with any evidence demonstrating that any of the decisionmakers—Mr. Byrne, Ms. Moody, Mr. Oliver, or Ms. Valladares—knew that he had filed with the EEOC when they voted to terminate him.[7] Indeed, he concedes as much and instead argues that "the converse is also true – simply no evidence exists that they were *unaware* either." (ECF No. 26-1 at 16 (original emphasis).) But it is not GEO's burden to come forward and prove the decisionmakers' lack of knowledge.

On the contrary, Mr. Phillip bears the burden of establishing a causal connection between the protected activity and the adverse action, and he cannot do so "without some evidence that the individuals responsible for the adverse action knew of the … protected conduct at the time they acted." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015); *see also Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007)

---

[7]     Mr. Phillip filed his charge of discrimination with the EEOC on October 27, 2020, and GEO fired him two days later. Of course, this timing could raise eyebrows, but only if the individuals who decided to fire Mr. Phillip knew that he filed with the EEOC. Absent such evidence, this timing amounts to nothing more than a coincidence.

(affirming summary judgment on retaliation claim where, *inter alia*, plaintiff did not proffer any evidence that the supervisors responsible for the adverse actions were aware that plaintiff had complained to the EEOC). Without this evidence, Mr. Phillip cannot make out a *prima facie* case of retaliation under Title VII, Section 1981, or the PHRA, and GEO is entitled to summary judgment as a result.

### 2.      Pretext

Though Mr. Phillip has made out a *prima facie* case of disability retaliation under the ADA and PHRA, those claims nevertheless fail because, as set forth above, he has no evidence of pretext. He offers no reason to doubt the truth of GEO's explanation for his termination, nor does he point to evidence making it likely that retaliation was the real motivator. Likewise, this lack of evidence is another reason why Mr. Phillip cannot prevail on his other retaliation claims under Title VII, Section 1981, and the PHRA.

### E.      Aiding And Abetting Liability Under The PHRA

Because Mr. Phillip does not have sufficient evidence to establish a violation of the PHRA, he cannot prevail on his aiding and abetting claims against Lt. Lubrano and Mario Colucci. Mr. Colucci is also be entitled to summary judgment on this claim for the independent reason that there is no evidence that he was involved in any of the conduct that Mr. Phillip challenges in this lawsuit. Indeed, in Mr. Phillip's opposition to Defendants' motion for summary judgment, he does not address this claim against Mr. Colucci at all.

Thus, I consider his claim against Mr. Colucci to be abandoned. *See, e.g.*, *Carroll*, 301 F. Supp.3d at 511, 512.

## IV.  CONCLUSION

Although judicial estoppel does not bar Mr. Phillip's claims in full, it makes no difference because he has not come forward with sufficient evidence to support any of them. As a result, Defendants are entitled to summary judgment. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*

JOSHUA D. WOLSON, J.

May 23, 2024